Our next case is Yeda Research and Development v. Abbott GmbH consolidated, that's case 15-16-62, and we've consolidated for purposes of oral argument today that case of Abbott GmbH v. Yeda Research and Development. Mr. Nilsson, we've given you 20 minutes due to the consolidation. I understand that you're reserving 5 minutes of the 20 minutes for rebuttal, is that correct? That's correct, Your Honor. The other side has 20 minutes in total time.   Thank you, Your Honor. Good morning. May it please the Court. This case is unlike any of the inherency cases. Okay, before you get to the merits, and I don't want to take up too much time because this is complicated, but I really don't understand why you have appealed separately from the 2008 order. It's an interlocutory order, and you're either out of time or it was an interlocutory order. It seems like you could have raised those arguments to Judge Collier and then appealed from that decision and included them all together, but I don't see how it's possible as a separate appeal. There were obviously two district court decisions in these proceedings, Your Honor, so the separate judgment from Judge Urbina and then the separate... There's not a judgment from Judge Urbina that ever became final. You tried to appeal from that once, and we said no. Correct. It went back to the board. The board adopted his reasoning with regard to the 08-9 application. You put that in your complaint when you went up to Judge Collier. I think there's references to that, but then you never argued anything about the 08-9 application to her. And so you didn't seem to me to preserve any arguments with regard to the 08-9. You can't appeal separately from a 2008 interlocutory order. Well, we were dismissed for lack of finality when we appealed the 2008 decision. Right. And so it went back to the board. The board issued a new decision, and a new action was instituted that involved that decision. And you actually went up to the district court again, but you didn't renew those arguments. There wasn't an opportunity to renew those arguments. The district court had already ruled on the 08-9 application. You still have to preserve them. All that remained to be decided was the 07-2 application. But it's still part of that case. It's not a separate case. So even if you hadn't waived it by not arguing it at Judge Collier, it is part of the 62 action. It's not a separate appeal. Well, it was a separate district court action, which we had a right to appeal for. That's not the way things work. I'm sorry, Your Honor. I mean, basically, you've doubled your briefing pages by filing a separate appeal when it's all part of the same action. Let me ask you one more question, and I'll let you go. Because I know you want to get to the merits, and this is all kind of subsidiary. What does it matter to you about the 89 application and whether that makes their patent invalid if you don't win the 72? If Judge Collier is right that the 72 has sufficient written description and enablement, and therefore gives them priority, does the 89 application matter at all? It should. There would have to be a chain of priority in order for Abbott to get the benefit of the 07-2 application. In order for the 915 patent to get the benefit of the 07-2 application, on paper, there would need to be a chain of priority. So let's assume she's right about the 07-2 application providing written support and enablement, and therefore gives them priority for the 915 patent. I'm not saying that that's how I'm deciding, but just for purposes of trying to sort out these procedural issues. If she's right, then why would we need to reach whether Engelman invalidates the 915 patent? Isn't the only reason to have the 89 application in there to address that? The 72 would supersede that as well. My understanding is that there would still need to be a chain of priority in order for Abbott and its 915 patent to get the benefit all the way back to the 07-2 application. The 08-9 application is intervening, and they would have to get the benefit of that as well. I might be able to help the court. We'd like to focus today on the 07-2 application and Judge Collier's decision. I'm happy to answer more questions about Judge Urbina's decision and the 08-9 application. I think you've waived that. I don't think we have jurisdiction. My colleagues might disagree, but why don't you get to the merits? This case is unlike any of the inherency cases that Abbott relies on. Let me ask you a question. Abbott's patent has expired, correct? Correct. So you're pursuing an interference, and as a result of that, you're looking to get your own patent. Correct. Basically, you want that to grant you 17 years of protection on a protein that's already in the public domain. Hasn't society already paid the price to keep that protein in the public domain? The way I'd respond to that question, Your Honor, is that it's not Yada's fault that we're here in 2016 arguing about this. Yada tried to resolve this case a long time ago. She tried to appeal directly to the Federal Circuit in 2008. It's unfortunate that the delay happened. The interference was declared in 1996. The Board decided the interference fairly expeditiously in 2000. It wasn't Yada that appealed to a 146 action. So, again, there's been some delay. We regret that, but it hasn't been of Yada's making, and Yada shouldn't be prejudiced. Okay, that's fine. You've answered the question. Well, you have improperly tried to appeal interlocutory orders that delayed the proceedings. I mean, there's no doubt that 2008 order was interlocutory. I don't know why you ever filed an appeal on that. Well, in an abundance of caution, we were concerned that we might be deemed as having waived our right to appeal that decision at that point. So that's why we appealed. The Federal Circuit disagreed with us, obviously, and here we are. What I'd like to direct the Court's attention to, if possible, is on the merits. This case is unlike any of the inherency cases that Abbott relies on. Not the least, because in your reply brief in 1662, you used the term mischaracterized at pages 10, 12, 14, and 16 to describe what Abbott says. When somebody says something like that, I read it really carefully, and I'd be really careful of using that kind of language. It's clear you disagree, and you have reason to disagree with their interpretation of the euphonious Wallach case. But despite that, I don't think it constitutes mischaracterization. Okay, Your Honor. Well, we felt that the test that we had been articulating wasn't being stated fairly by the other side, but so be it. If I could direct the Court, again, though, to the merits of the case, particularly on the 1662— You argue that N. Ray Wallach favors your position. I'm sorry, Your Honor? You argue that N. Ray Wallach favors your position? That's right. Explain that. If the Court had granted—I'm sorry, if the fundamental holding in Wallach was that because the Wallach inventors— and those were Yeda inventors, by the way, those were the same inventors in Wallach, and that was dealt with a similar application or a related application to Yeda's application at issue in this case— the Court held, essentially, that because Yeda had only disclosed so much of the amino acid sequence of the protein, that it wasn't in possession of the entire amino acid sequence of the protein, even though the claim certainly was directed to DNA. But the argument that we made there, which the Court rejected, was that simply because you have possession of the protein doesn't mean you have possession of the protein's amino acid sequence. You said in Wallach, wasn't there evidence that the full amino acid sequence could be deduced from the partial sequence that was present? I don't think that that was the evidence, Your Honor. I don't think that that was the evidence in Wallach, and it's certainly not the evidence in this case that based on what was disclosed in the 072 application— Well, I'm quoting from that case of 1335. Anyway, go on. Okay. So Wallach does favor our position, but I'd like to focus on the facts in connection with the 072 application. And like I said, and this goes to the core of Abbott's inherency arguments, this case isn't like any of the inherency cases Abbott relies on. Unlike in all of those cases, no one could have gone back to any of the samples that Abbott had when they filed the 072 application and have identified any of the contiguous complete sequences of account. No one could have done that. What Abbott had when they filed the 072 application wasn't enough. They hadn't finished inventing. Later on, they finished inventing. They came close to it in the 089 application, for example, but when they filed the 072 application, they hadn't finished inventing. They actually had to develop an additional protocol that would yield a sample from which you could actually identify those sequences. You couldn't get to those sequences of account from anything Abbott had when they filed the 072 application. If it was disclosed in the initial application, wouldn't that have necessitated the existence of what we call, what we have here is a missing amino acid sequence? I'm sorry, I don't follow the question you're asking. Wasn't the sequence, the amino acid sequence that you say was not present in the original application, wasn't that inherent in that? No, it was not inherent. It was not inherent because the sample wasn't purified and isolated. The test here, it's not, was the TBP2 protein in there? Did they have it in their sample? For example, they also had it in the urine that they started off with, but no one's saying that the complete sequence of the count was inherent in that urine. No, what they had to do was they had to purify and isolate the protein to a point where one of ordinary skill in the art, and this is inherency, one of ordinary skill in the art would necessarily see those sequences, and they didn't get to that when they filed the 072 application. The only way that they did get to it, the only way that they got from point A to point B from the 072 application to any of the sequences of the count was they had to do further inventing. They weren't done inventing when they filed the 072 application. They completely changed their protocol. What was the further inventing? The further inventing was that they changed their protocol. The protocol of the 072 application. But the invention is not a method for purifying and isolating. It's the protein. It's a purified and isolated protein, and they hadn't gotten to that yet when they filed the 072 application. The court found that the seven characteristics of the amino acid that were disclosed in the specification identified the TBP2 protein as being present, as being subject to the 072 and 082 specifications. That was wrong, especially in the sense that the court seemed to think that what was in the 072 application was sufficient to distinguish the prior art. It wasn't sufficient to distinguish the prior art, especially the Sechinger reference that we've discussed in our briefs. In prosecution, when it came right down to it, and when Abbott had to overcome the Sechinger reference, they relied on one thing and one thing only, and it was a sequence that was found in the count. It wasn't a sequence from the 072 application. It wasn't anything else in the 072 application. When they had the chance to tell the examiner and put it all on the line and say, here are all these characteristics that distinguish our protein from the protein of Sechinger, they relied on only one thing. Is the protein they discovered and described in the 072 application any different than the protein they discovered and described in the 915 patent? Yes, it is. They actually relied on a different form of the protein to get to the count. It's very odd, but when they changed their protocol, they used different chromatography columns. They even changed their source. They started working with a different source that they didn't report in the 072 application, and when they did all that, one of the sources... What's your support for that? I'm sorry? What's your support for that? Because that seems contrary to what the district court found. Oh, there's no dispute about this, Your Honor. Even Abbott doesn't dispute it. We've discussed it extensively. The evidence was unrebutted on this. Some support can be found at age... The protein that was the basis for the count was a different form of the protein. They actually relied on... They actually started working with urine from people without fever. The 072 application says use urine from patients with fever. They started using ascites fluid later. This is all part of the additional inventing that they did. They weren't done inventing when they filed the 072 application, and they actually... Correct. But it was a different form of the protein. You're going to disagree that they claimed a different protein. There are some similarities, but the fact remains, and it's undisputed and it's unrebutted that they relied on a different protocol from different sources and even this different form of the protein, and ultimately to get to the count... What do you mean when you say different form of the protein? This discussion about different protocol and different methods seems not particularly relevant when we're not talking about a method claim. But if you're saying it's a different form, I don't know what that means. It doesn't meet their version of their parts of the count. Parts B and C of the count say a 42 kilodalton protein. That's what they say that they invented by the time they filed the 072 application. Well, to get to the count, they were relying on, among other things, a 30 kilodalton form of the protein. It wasn't the same form of the protein, and it doesn't matter that part B of the count, for example, is directed to a protein. This is unlike any other case in that in order for Abbott to get from point A to point B, to get from the 072 application in order to the count, they had to do all this other stuff. They weren't done inventing. You seem to place some emphasis on this difference between the 42-whatever and the 30-whatever. If the 072 application had said 42-whatever that means and had the complete amino acid sequence that was in the patent, would that be the same protein, even if it had a 30-count-whatever in the application? I'm sorry. If the 072 application said 42 kilodaltons... I'm trying to figure out what the relevance of this difference between this 42 and 30 you're referring to is. The relevance is that they weren't done inventing when they filed the 072 application. If you take a look at any of the inherency cases they rely on, and I would submit even if you take a look at this course... Can you answer my hypothetical? Maybe you don't get it. I don't do this kind of stuff as my day job. Both applications, the 072 application and 915, say it's this protein, this characteristic. Both have the entire amino acid sequence. The only difference is the 072 uses a 42 number and the patent uses a 30 number. Are those the same protein? For purposes of the interference, the answer would be yes, and it's because Yada's part of the count is to a 30 kilodalton form of the protein. They have different molecular weights. I'm sorry. That's what it is. You're talking about the 42 and 30 molecular weights. If you think that's different, though, then why would the protein in the earlier application be the same protein? If you think there's some relevance to the difference in molecular weights. The protein that they reported in the 072 application, it was a contaminated sample, but the protein that was in there, it's not the same protein. They didn't stick with just that in order to get to the count. They had to rely, like I said, on all this different stuff. They weren't done inventing. They had to develop a new protocol where they substantially changed their chromatography in order to get to a product. They also changed the sources that they worked with. Isn't it enough for the specification to identify the process that a protein can be obtained? You don't have to list all the proteins. Not if your specification has described the process that you go to obtain a particular protein. No, not across the board, Your Honor. That's a fact-specific scenario here. And I believe in Enri Edwards where the court reached such a result, the court was very particular in clarifying this isn't a bright-line rule here. But the evidence in this case shows that to one of ordinary skill in the art, viewing the 072 application, they hadn't gotten there yet. They had only identified a significantly contaminated sample. I think one of the issues with this case is that for lawyers looking at these documents and comparing the 072 application to the 915 patent, it's very tempting just to see some of the consistencies that there are between the two and say, well, it looks like that was close enough. But that's not the test. The test of written description is how the application would have been viewed by one of ordinary skill in the art at the time the application was filed. And there's extensive evidence in this case that one of ordinary skill in the art, viewing the 072 application, would not have viewed it as demonstrating a purified and isolated protein or a definitively identified protein, but instead would have considered it as evidence of considerable contamination, that no single protein had been purified and isolated. Thank you. All right. Thank you, Mr. Nelson. We'll restore Mr. Nelson's rebuttal time back to three minutes, okay? Mr. Ferguson? Good morning, Your Honor. Your Honor, may it please the Court? James Ferguson on behalf of Abbott GmbH. I agree with counsel that this is a very unusual case. The Court has already noted that in this case, IATA is seeking in 2016 a patent to protect a protein that was discovered in 1989, a protein that has already been the subject of 17 years of patent exclusivity. Your patent's expired, right? Correct. Do you have any pending litigation asserting that patent? No. Do you have any other patents that rely on that patent? No. So there's nothing going to be from you ongoing on this? You're asking the question my client has been asking me, Your Honor. We will gain absolutely or lose absolutely no patent protection as a result of the outcome of this litigation. We're in this litigation as a very reluctant defendant. The only reason we can't even settle the case because IATA is not seeking money damages or injunction. They're looking for a new claim relating to patent validity, and obviously even if my client were willing to walk away from all the representations it's made to the PTO. Can I ask you this? I shouldn't, but I'm going to. Since you have no financial interest in this whatsoever, I know at the time you filed this patent there may have been some question about patentability. I mean, is a purified protein even patentable any longer after the recent Supreme Court precedent? Very good question, Your Honor. You don't have to commit, but it seems to me that some of the recent Supreme Court cases make this highly suspect patent altogether. I wouldn't want to be quoted, Your Honor, so I'll simply say I agree that there are some questions about patentability in light of recent Supreme Court decisions. Could you address? I think I understand your friend's argument that because you claimed a purified and isolated protein in the 915 patent, that the 072 application has to provide written description and enablement for the purified and isolated protein, and because it didn't describe the whole amino acid sequence, a person of ordinary skill wouldn't see that application as showing the purified version of the protein, but some other version of the protein. Why isn't he right about that? I understood his argument, Your Honor, to be focusing on Abbott's laboratory notebooks and what they revealed as opposed to the disclosure in the 072 application and the 915 application. I was very surprised by some of the statements that I understood counsel to make in light of concessions that Abbott, I'm sorry, that Yada made before the district court, and the district court recites at page 25 on her opinion. Those concessions include the following. Number one, an amino acid is a unique and inherent characteristic of a protein. Number two, the full amino acid sequence is not necessary to identify unequivocally a protein. And number three, the nine amino acids that Abbott identified in its disclosure document, together with all the other biological data, including the 42 kilomolecular weight, unequivocally identified that protein as TBB2. What follows from that, the fourth conclusion, also an undisputed fact, is that the protein that was disclosed by the first filed application is the same protein as is recited in the count. You will search Yada's briefs in vain for any statement that denies that the protein that's disclosed in the 072 application is the same protein that's recited in the count. What they're saying is, notwithstanding that, there's not sufficient written disclosure because it doesn't contain these other amino acids. And as we lay out in greater detail in our brief, those amino acids are inherently disclosed. They meet the requirements of inherent disclosure cases because, number one, the amino acids are inherent to the protein, no dispute. And number two, they're not material to patentability because they're not necessary to identify the protein. Again, Yada conceded, as recited in page 25 of the district court's opinion, that only one protein, one and only one protein, has the amino acids that are disclosed in the 072 application. So your opponent argues that we should reject the inherency arguments on the basis of our decision in Wallach. What's your response to that? I think my response is that my opponent, most respectfully, is mistaken. That both Wallach and Sanofi squarely hold that a partial amino acid sequence together with other biological data is sufficient to identify a protein. That's almost an exact quote from Sanofi, and Sanofi cites Wallach for that proposition. And, Your Honor, as we've argued at great length in our brief, that's exactly what we have here, a partial amino acid sequence together with other biological data that unequivocally established the protein that the Abbott inventors in 1989 had possession of the same protein that's now recited in the count. There are two other grounds that I just want to briefly touch on for sustaining the district court's opinion, a decision rather, and the first is judicial estoppel. Because Yada's current argument is directly contrary to representations that Yada successfully made to the patent office in the prosecution of the patent and in the interference. You may recall that Yada relied on the Engelman reference and persuaded the patent office that the Engelman reference, which contained only five amino acids, invalidated the Abbott patent on grounds of anticipation. Now, if the five amino acids in the Engelman reference are sufficient to invalidate, on anticipation grounds, Abbott's patent containing 22 amino acids, that's pretty inconsistent in the district court so found with their current claim that our 072 application with nine amino acids is insufficient from a written description perspective. The last point I want to make is to remind the court, particularly in light of the challenge to the methodology that Abbott used in 1989 in identifying the protein. In 2003, we replicated every step of the same methodology that's disclosed in the 072 application, and we did it in the presence of experts from Yada. That's not something you see all the time in patent law because it's high risk. If you make a mistake, the patent's gone. But we did it, their experts were there, and it resulted in TBB2, and so this was a compelling real-world demonstration that the method of purifying and isolating the protein that was disclosed in the 072 patent results in the protein, a separate ground for sustaining the district court's decision on written description. Unless the court has any questions, we'll rely on our brief. Well, I just want to say the same thing I said to your opposing counsel, and that is you got stuck with a requi-break, which accused you, as far as I'm concerned, accused you of misconduct, and I couldn't find any, and I'll invite you to say anything else if you want to, but you don't have to. I appreciate your comments, Your Honor. Counsel for Abbott said that, as of the filing of the 072 application, that Abbott had possession of the protein. We're not disputing that. We're not disputing that a protein satisfying the limitations of the count was in their sample, but that's not the test. The test wasn't in there. It was also in the urine, and that's not patentable. You had to purify and isolate the protein to the point where one of ordinary skill in the art would necessarily see the sequences, and that's why this case is different from all of this court's other cases that Abbott has cited, including recent cases like Cubist, which was decided after the briefs, where one of ordinary skill in the art couldn't necessarily identify the sequences of the count from the sample that Abbott had, any of the samples that Abbott had when they filed the 072 application. Again, it's different from all of the inherency cases that Abbott has relied on, as well as this court's case, this court's decision in Sanofi. Counsel for Abbott referred to 2003 as well. The results of the 2003 experiments were disputed. Yada's experts took a look at the results and said they don't look any better to us than the 1989 results did. There's a genuine issue of material fact there that should have precluded summary judgment being entered in favor of Abbott, and no matter what the results of the 2003 experiments were, they don't negate the fact that in 1989, the one and only time that Abbott tried to practice the 072 protocol, it resulted in a complete failure. It didn't even result in the sequences that are disclosed in the 072 application itself. Did the experiments result in TBP2? It's not clear whether they had it in that sample, Your Honor. They may have. In the sample that's reported in the 072 application, there was some TBP2 in there, but again, that's not enough because the sequences weren't inherent in that sample. You had to do something more. Unlike all this court's other inherency cases, you had to do more inventing in order to get to those sequences. This is inherency. It can't be established by probabilities or possibilities. The same comment is applicable to the 2003 experiments. When you compare those to what happened in 1989, they say they got it to work in 2003. They clearly didn't in 1989. They got something that was so bad, they didn't even report it in the 072 application itself. They said it had very weak activity. Judge Collier noted that in her opinion. That's not sufficient for written description, and it doesn't satisfy this court's test for inherency either. One last comment I would make is that on material to patentability, that was a burden that Abbott bore in this case. They had to show, in order to establish inherency, that the sequences of the count weren't material to patentability. There's no dispute that when it counted, when it actually mattered, that they relied on a sequence not in the 072 application to distinguish the prior art. And there's no evidence, including no evidence from their experts, that specifically addressed that Sechinger reference and said anything different. There's no evidence from their experts saying that Sechinger could be distinguished on any other basis. We just have to go back to the objective record of the prosecution history, and you see from that that they absolutely relied on a sequence of the count in order to get their claims issued. Do you have any concluding sentences or thoughts? Only that because the sequences of the count were material to patentability. As a matter of law, under this court's binding precedent, such as in Hitzeman, Abbott hasn't established inherent written description. Thank you, Your Honors. Thank you very much.